IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRUIT

_____

No. 22-10704-AA

_____

DIANA B. CLUFF, as personal representative
of the ESTATE OF GUSTAVO BEAZ,

*Plaintiff – Appellant*;

v.

MIAMI-DADE COUNTY, CAPTAIN ARTIS WEST,
ALLISON AULT, and JEROME WELDON,

*Defendants – Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Florida
No. 21-cv-23342-KMW

_____

**APPELLANT'S INITIAL BRIEF**

_____

Law Offices of Max R. Price, P.A.
*Attorneys for Appellant*
6701 Sunset Drive #104
Miami, Florida 33143
Tel.: (305) 662-2272
Fax: (305) 667-3975
Primary: mprice@pricelegal.com
Secondary: mia@pricelegal.com

By: /s/ Max R. Price_____
MAX R. PRICE, ESQ.
FBN: 651494

May 27, 2022

## <u>Certificate of Interested Persons</u>

Pursuant to 11th Cir. R. 26.1-1(a), the Appellant hereby files a Certificate of Interested Persons and Corporate Disclosure Statement, as currently known:

Ault, Allison (Defendant/Appellee)

Beaz, Jacqueline F. (Beneficiary of Plaintiff/Appellant)

Bonzon Keenan, Geraldine (Miami-Dade County Attorney)

Cluff, Diana B. (Personal Representative and Beneficiary of Plaintiff/Appellant)

Estate of Gustavo Beaz (Plaintiff/Appellant)

Law Offices of Max R. Price, P.A. (Counsel for Plaintiff/Appellant)

McAliley, Hon. Chris M. (United States Magistrate Judge)

Miami-Dade County (Defendant/Appellee)

Miami-Dade County Attorney's Office (Counsel for Plaintiff/Appellee)

Price, Max R. (Attorney for Plaintiff/Appellant)

Vosseler, Zach (Assistant County Attorney)

Weldon, Jerome (Defendant/Appellee)

West, Artis (Defendant/Appellee)

Williams, Hon. Kathleen M. (United States District Judge)

The Appellant further states that, to the best of its knowledge, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement ...............C1-1

Table of Contents ...........................................................................................................i

Table of Citations.................................................................................................... iii

Statement Regarding Oral Argument ..................................................................... viii

Jurisdictional Statement ...........................................................................................ix

Statement of the Issues...............................................................................................1

Statement of the Case.................................................................................................2

      A.  Factual Allegations..............................................................................2

      B.  Introduction and Background ..............................................................6

      C.  Procedural History ..............................................................................8

      D. Standard of Review ...........................................................................10

Summary of the Argument........................................................................................10

Argument...................................................................................................................11

  I.  THE DISTRICT COURT ERRED IN FAILING TO TAKE ALL ALLEGATIONS AS TRUE AND IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFF WHEN FINDING THAT (A) THE AMENDED COMPLAINT DID NOT STATE A CLAIM FOR VIOLATION OF A CONSTITUTIONAL RIGHT, AND (B) EVEN IF IT DID, ANY SUCH RIGHT WAS NOT CLEARLY ESTABLISHED. .......................................13

    A. Plaintiff Has Stated A Plausible Claim For A Substantive Due Process Violation As The Actions Of The Individual Defendants As Alleged Demonstrate An Extreme and Deliberate Indifference And Purpose To Cause Harm Which Shocks The Conscience. ...........................................16

i

B. The Allegations As Pled Are Sufficient To Show That Beaz's Constitutional Right Was Clearly Established. ..........................................30

II. PLAINTIFF HAS PROPERLY ALLEGED A §1983 MUNICIPALITY CLAIM AS THE AMENDED COMPLAINT ASSERTS (A) ALLEGATIONS OF PRIOR SIMILAR CONDUCT; AND (B) ALTERNATIVELY, THE LIKELIHOOD OF CONSTITUTIONAL VIOLATIONS MADE THE NEED FOR SUPERVISION OBVIOUS. ...................................................36

A. Plaintiff Has Stated A Plausible Claim For A Substantive Due Process Violation As The Actions Of The Individual Defendants As Alleged Demonstrate An Extreme and Deliberate Indifference And Purpose To Cause Harm Which Shocks The Conscience. ...........................................37

B. Alternatively, The Need For Supervision Was So Obvious That Prior Incidents Are Not Needed. ........................................................41

III. IT WAS AN ABUSE OF DISCRETION TO DISMISS THE AMENDED COMPLAINT WITH PREJUDICE AND DENY LEAVE TO AMEND UPON THE PLAINTIFF'S FIRST REQUEST. ....................................45

Conclusion ................................................................................48

Certificate Of Compliance ................................................................49

Certificate of Service ................................................................49

# Table of Citations

**CASES**

*Am. Fed'n of Labor v. City of Miami,*

637 F.3d 1178 (11th Cir. 1998) ....................................................................37

*Anderson v. City of Minneapolis, et al.,*

18-1941 (8th Cir. 2019) ........................................................................ 11, 32

*Anderson v. Creighton,*

483 U. S. 635 (1987)....................................................................................15

*Ashcroft v. Iqbal,*

556 U.S. 662, 672 (2009) .................................................................. ix, 14, 42

*Bell Atl. Corp. v. Twombly,*

550 U.S. 544, 555 (2007) (emphasis added) ......................................... 15, 42

*Board of County Com'rs v. Brown,*

117 S.Ct. 1382, (1997)..................................................................................37

*Bracewell v. Nicholson Air Services, Inc.,*

680 F.2d 103 (11th Cir. 1982). ............................................................. 15, 45

*Butler v. Sheriff of Palm Beach County,*

2012 U.S. App. LEXIS 13844 (11th Cir. Fla. July 6, 2012).................. 14, 15

*Crawford-El v. Britton,*

523 U.S. 574 (1998)......................................................................................15

*Cty. of Sacramento v. Lewis,*

523 U.S. 833 (1998)............................................................................. 17, 31

*Foman v. Davis*,

371 U.S. 178, 182 (1962) ................................................................ 12, 46, 47

*Gold v. City of Miami*,

151 F.3d 1346, 1352 (11th Cir. 1998) ........................... 12, 37, 41, 42, 43, 45

*Groover et al v. Polk County Board of County Commissioners, et al.*,

No. 8:2018cv02454 (M.D. Fla. 2020) ....................................................... 20, 21

*Hamilton v. Cannon,*

80 F.3d 1525 (11th Cir. 1996) ........................................................................34

*Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982) ............................................................................ 13, 15

*Hill v. Dekalb Reg'l Youth Det. Ctr.*,

40 F.3d 1176 (11th Cir. 1994) ................................................................... 35, 43

*Hoefling v. City of Miami*,

811 F.3d 1271, 1276 (11th Cir. 2016) ....................................................... 11, 36, 40

*Hope v. Pelzer*,

536 U.S. 730, 739 (2002) ............................................................... 13, 35, 44

*Ironworkers Local Union 68 v. AstraZeneca Pharm., LP,*

634 F.3d 1352, 1359 (11th Cir.2011) ......................................................10

*Jackam v. Hosp. Corp. of Am. Mideast, Ltd.,*

800 F.2d 1577, 1579-80 (11th Cir. 1986)................................................ 15, 28

*Johnson v. Dallas Indep. School Dist.*

38 F.3d 198 (5th Cir. 1994) ................................................................18

*Lanfear v. Home Depot, Inc.*,

    679 F.3d 1267, 1271 (11th Cir. 2012) ........................................................14

*Lee v. Ferraro*,

    284 F.3d 1188, 1194 (11th Cir. 2002) ........................................................13

*McClendon v. City of Columbia,*

    305 F.3d 314 (5th Cir. 2002) ...................................................... 17, 18

*McClish v. Nugent*,

    483 F.3d 1231 (11th Cir. 2007) ...................................................30

*Mercado v. City of Orlando*,

    407 F.3d 1152 (11th Cir. 2005) ...................................................30

*Mitchell v. Forsyth*,

    472 U. S. 511 (1985).................................................... 15, 23

*Monell v. Dep't of Soc. Servs. Of City of New York,*

    436 U.S. 658 (1978).................................................................36

*Nix v. Franklin County School Dist.*

    311 F.3d 1373 (11th Cir. 2002) ...................................................17

*Olson v. Barrett*, No. 6:13-CV-1886-ORL,

    2015 WL 1277933 (M.D. Fla. Mar. 20, 2015) ................................ 19, 21, 31

*Pearson v. Callahan*,

    555 U.S. 223, 232 (2009) .................................................... 14, 30

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,

    917 F.3d 1249, 1260 (11th Cir. 2019) .................................................. 14, 22

*Ross v. United States,*

910 F.2d 1422 (7th Cir. 1990) ...................................................... 11, 32, 33

*Thomas v. Town of Davie*,

847 F.2d 771 (11th Cir. 1988) ...................................................................47

*Townsend v. Jefferson Cty.*,

601 F.3d 1152 (11th Cir. 2010) .................................................................17

*Waddell v. Hendry Cty. Sheriff's Office*,

329 F.3d 1300 (11th Cir. 2003) ........................................................... 17, 18

*Waldron v. Spicher,*

954 F.3d 1297 (11th Cir. 2020) ..................................... 11, 30, 31, 32, 33, 34

*Williams v. Palm Coast Blue Water Int'l Corp.*,

954 So. 2d 1264 (Fla. 5th DCA 2007)........................................................23

**STATUTES**

28 U.S.C. § 1291 ..................................................................................... ix

28 U.S.C. § 1331 ..................................................................................... ix

42 U.S. Code § 1983 ................................................. i, ix, 9, 36, 37, 45, 47

Fla. Stat. § 401.45 .....................................................................................9

**OTHER AUTHORITIES**

*Black's Law Dictionary,* Third Pocket Edition (2006).................................... 33, 34

Moore, Federal Practice (2d ed. 1948) ................................................................46

**RULES**

11th Cir. R. 34-3 ..................................................................................... i

Fed. R. App. P. 32 ...............................................................................49

Fed. R. App. P. 34 ............................................................................... i

Fed. R. Civ. P. 8 ................................................................................42

Fed. R. Civ. P. 12 ....................................................... 10, 14, 15, 24, 42, 45

Fed. R. Civ. P. 15 ....................................................... 12, 46, 47

Fla. R. Civ. P. 1.130 ..........................................................................23

## **Statement Regarding Oral Argument**

Plaintiff/Appellant respectfully requests oral argument. This is a case of first impression as the facts evidence that the individual Defendants/Appellees' (paramedics) acted consciously and with a purpose to cause harm, and the Defendant/Appellee County's pattern of turning a blind eye despite actual knowledge that its employees are acting in a manner they know poses an extremely great risk of serious injury to its constituents. It also appears that, despite the established precedent in this jurisdiction confirming that there is no heightened pleading standard for 42 U.S. Code § 1983 claims, the district courts continue to apply one. Plaintiff/Appellant believes that this Court's decisional process will be significantly aided by oral argument. See Fed. R. App. P. 34(a)(2); 11th Cir. R. 34-3(b).

## Jurisdictional Statement

Plaintiff/Appellant, Diana B. Cluff as the Personal Representative of the Estate of Gustavo Beaz, brought suit alleging violations of Gustavo Beaz's constitutional rights under 42 U.S. Code § 1983, pursuant to 28 U.S.C. § 1331. On February 1, 2022, the district court granted Defendants' Motion to Dismiss with prejudice on qualified immunity grounds and based upon the district court's finding that Plaintiff/Appellant failed to state a claim upon which relief could be granted. Plaintiff/Appellant timely filed its notice of appeal on March 3, 2022. This Court has jurisdiction over the district court's final order and immediately appealable immunity ruling pursuant to 28 U.S.C. § 1291. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (qualified immunity).

## Statement of the Issues

I.     Whether the district court erred in failing to take all allegations in the light most favorable to the Plaintiff/Appellant when finding that (A) the Amended Complaint did not state a claim for violation of a constitutional right against the Individual Defendants/Appellees, and (B) even if it did, that any such right was not clearly established.

II.     Whether Plaintiff/Appellant has stated a plausible claim for relief under a § 1983 municipality claim against the County Defendant/Appellee based upon (A) its allegations that there have been prior instances of similar conduct, or (B) alternatively, that the likelihood of constitutional violations occurring in such a situation made the need for supervision obvious.

III.     Whether it was an abuse of discretion for the district court to dismiss the Amended Complaint with prejudice and deny leave to amend upon the Plaintiff/Appellant's first request.

<u>**Statement of the Case**</u>

**A. Factual Allegations**

At the time of his death, Gustavo Beaz ("Beaz") was sixty-six (66) year old father to two young women and grandfather to a one-year-old little girl, but he lived alone just a few blocks away from his eldest daughter, who is now the Personal Representative of his Estate and brings forth the underlying action. *See* Dkt. 1-1, ¶¶ 5-7. On Tuesday, April 2, 2019, at approximately 2:00 a.m., Mr. Beaz was having difficulty breathing. Dkt. 1-1, ¶ 26. This prompted him to press the button on his medical device in order to receive assistance and treatment from Miami-Dade County's (hereinafter the "Defendant County") paramedics (*Id.*), and while he waited, he continued to speak with dispatch. Dkt. 1-1, ¶¶ 29, 52. Mr. Beaz had no idea that, when they finally arrived, veteran paramedics Captain Artis West, Allison Ault, and EMT Jerome Weldon (hereinafter collectively referred to as the "Individual Defendants") would find him alive but decide not to treat him so that they could return back to the station to sleep. *See* Dkt. 1-1, ¶¶ 20, 85, 95. While treating and transporting Beaz to the nearest hospital would have taken at least two (2) hours minimum, declaring that he was "Dead on Arrival" ("DOA") had the Individual Defendants back at their station (known to the Defendant County as a self-proclaimed "Retirement Station") and in bed in just two (2) minutes. *See* Dkt. 1-1, ¶¶ 20, 34, 58; Dkt. 14, p. 10. In fact, these Individual Defendants made it back

2

to the station in less than half the time that it took them to arrive to Beaz's emergency, while driving on an empty three-lane highway on a Tuesday night at two in the morning. Dkt. 1-1, ¶¶ 32, 34. It is important to note that the Individual Defendant's Station is only one (1) mile away from Mr. Beaz's home, on a straight three-lane road. Dkt. 1-1, ¶ 32. Traveling this road at the regular speed limit of 45 mph would take only 1 minute and 36 seconds; when you consider that these Paramedics were traveling after 2:00 a.m. on a weeknight with almost no other cars in the area, and to a known emergency where they could have driven more expeditiously, it would have taken even less time. Dkt. 1-1, ¶ 32. Still, the PCR states that they arrived on scene 6 minutes and 40 seconds after dispatch and 5 minutes after they were "en route". Dkt. 1-1, ¶¶ 31, 34.

The Individual Defendants knew Beaz was alive because their handheld EKG showed that he had a heart rate and was by no means "flat-lined." Dkt. 1-1, ¶¶ 45, 47, 49. However, instead of rendering any care, they stood over him watching the EKG reading and waiting until his heart slowly stopped and until he flat-lined, as a result of a lack of oxygen – the very reason he had called the Defendant County for help ("difficulty breathing"). Dkt. 1-1, ¶¶ 29, 42, 47, 49-50, 54, 58. In an effort to transmit only the end portion of the EKG showing a flat-line, referred to as "asystole," the Individual Defendants left the EKG on Beaz for an extended period of time (much longer than is ever needed or done). Dkt. 1-1, ¶¶ 44-45, 49, 58-59.

3

this generated six (6) pages of EKG readings showing a flat-line, but unfortunately for the Individual Defendants, it was the first part of the EKG reading showing Beaz was alive and with a heartbeat that was automatically transmitted as an attachment to the Patient Care Report ("PCR"). *See Id*.; *see also* Dkt. 14, p. 10. Had this not been the case, Beaz's family would never have learned that the Individual Defendants falsified[1] the PCR in an effort to cover up their malfeasance, and because the Defendant County employs an unofficial policy and custom of "don't ask, don't tell," they deliberately only learn of its employees' wrongdoing and failure to follow procedures when a constituent self-investigates and makes a complaint. *See* Dkt. 1-1, ¶¶ 22, 35, 36, 62-63, 65, 67-68, 73. Specifically, the County Defendant is the only emergency rescue services department in all of South Florida that does not have a procedure for reviewing the PCR and associated EKG readings to confirm that its employees are not causing harm and are following policies and procedures. *See* Dkt. 1-1, ¶¶ 22, 36, 62, 64; Dkt. 14, p. 17.

In this particular case, the Individual Defendants were required to provide care to Beaz under all circumstances – even before the EKG reading was ever taken –

---

[1] In the PCR, the Individual Defendants wrote that Beaz was "asystole," which means he was flat-lined, while the EKG reading from the monitor they held in their hands shows the exact opposite. In addition, it is a medical impossibility for Beaz to have been "cold to the touch," as they wrote in the PCR, because it takes hours after death for that to occur, and the Individual Defendants were at his side less than ten minutes after he was heard speaking and communicating his difficulty breathing.

because they knew he had called for help just minutes before and was communicating with dispatch. Dkt. 1-1, ¶¶ 29, 40, 52, 63. In addition to this, Miami-Dade Fire Rescue Medical Operations Manual Protocol 27 – Death in the field, it is necessary for the patient to have tissue decomposition, liver mortis, or rigor mortis. If these are not found upon assessment, the patient **must, in all cases,** be treated and transported to the hospital for additional care. Dkt. 1-1, ¶ 40. Not only is the Individual Defendants' assertion that Beaz was "cold to touch" a false statement, there was a clear failure to document any one of the three (3) additional presentations that are required to make a DOA determination. Dkt. 1-1, ¶¶ 42, 52-53. There is no reference of tissue decomposition, rigor mortis, or livor mortis in the report, because none of these would be present in a patient who was confirmed to have been alive, conscious, and alert enough to communicate just minutes prior to their arrival. *Id.; see also Id.* at ¶ 52. Accordingly, even before the EKG reading, this call should have never been considered a DOA by the Paramedics. Dkt. 1-1, ¶¶ 44-54. Having said that, the facts of this case rise to a level of purposefulness because the Individual Defendants had actual knowledge that Beaz was alive through the EKG reading they held in their hands. *See* Dkt. 1-1, ¶¶ 44-51, 85, 95. The difference between a flat line on an EKG and a reading with rhythm or movement is obvious to any layperson, let alone to the purportedly trained Individual Defendants. *Id.* at ¶ 47.

When the EMS Officer In Charge (OIC) was contacted on behalf of Beaz's surviving children, in order to report the incident, he explicitly stated on behalf of the Defendant County, "don't worry, no one will get in trouble over this." Dkt. 1-1, ¶ 66. This was after the same EMS OIC confirmed (in the same call) that there was no explanation for why the Individual Defendants failed to render care or transport Beaz. *Id.* True to the Defendant County's custom, an investigation was only performed after Plaintiff self-investigated and made a complaint. Dkt. 1-1, ¶ 63. Despite the egregious circumstances and complaint that the Individual Defendants had acted with a purpose to cause harm, resulting in the death of Beaz, the Defendant County did not bother to investigate until several months after this complaint was made. In its conclusion, the investigating EMS Captain found as follows:

> Based on the initial dispatched information, the time of patient contact along with the confirmed patient rhythm that was documented from the lifepak, **I was not able to find any legitimate reasons in the protocols as to why Rescue 27 made the decision not to resuscitate the patient.**

Dkt. 1-1, ¶¶ 63, 67.

## B. Introduction and Background

In an effort to minimize the egregiousness of the conduct in this case, the Defendant County, in its Motion to Dismiss, regurgitates the false narrative written by the Individual Defendants, despite being fully aware that the narrative of the PCR is wholly inconsistent with the *objective* EKG readings contained within the very

same PCR. Furthermore, despite the findings of its own investigation, the Defendant County has also taken the contrary position that it "vigorously contests that its paramedics acted negligently and will defend against that claim in due time." Dkt. 10, p. 20.

This is exactly what the majority of Plaintiff's case is premised upon: the County will do and say anything to minimize and conceal the egregious acts of its employees, all the while purposefully refusing to monitor malfeasance or implement measures to confirm whether its employees are following guidelines and protocols. It is the County's unofficial policy or custom of "don't ask, don't tell." In doing so, the County has facilitated and fostered an environment where its employees are emboldened to act in a manner that the employees know will cause harm and ignore the County's policies and guidelines resulting in the violations of citizen's constitutional rights. Employees do so fully knowing that the County intentionally has no policy to review the PCRs and identify violations, and as such, the County, with its "don't ask, don't tell" policy, takes no action to either address its employees' misconduct through either additional training or discipline commensurate with the severity of the improper conduct. Until now, the impropriety of the County has never been challenged because no other victim has had the institutional knowledge as to how Miami-Dade County Fire Rescue operates or knowledge of the steps the County has taken in the past to cover up and claim a lack of knowledge as to its employees'

wrongful acts. This has allowed the County to continue with its unofficial policy or custom of turning a blind eye to its employees' violations of citizen's constitutional rights.

While the Defendants/Appellees would like this Court to believe that this is another instance of wrongful death arising from a mere failure to treat where a poor judgment call was made, in truth, the misconduct in this case goes well beyond the exercise of poor judgment. Instead, as alleged in the Amended Complaint, the Paramedics purposely and knowingly withheld aid to a person they knew to be alive and to whom immediate aid and assistance should have been rendered. The employees were emboldened to let Beaz die knowing the County's "don't ask, don't tell" policy and the mentality the County has perpetuated through its deliberate indifference and willful blindness. And unfortunately, the Individual Defendants were correct in their assessment because, to date, the Defendant County has failed to discipline them commensurate with the egregiousness of their acts and despite its own finding that there was "no legitimate reason" they could come up with to substantiate.

## C. Procedural History

On June 30, 2021, Plaintiff and Beaz's daughters filed a Complaint in Florida state court alleging seven counts against the Defendant County, Miami-Dade Fire Rescue Department, and the Individual Defendants, founded upon violations of 42

U.S.C. § 1983, violation of Fla. Stat. § 401.45(1)(a), negligence, vicarious liability, and outrageous conduct causing severe emotional distress. On July 8, 2021, before service upon the Defendants, Plaintiff and Beaz's daughters filed an Amended Complaint. Dkt. 1-1. At issue in this appeal are Counts I and II for § 1983 liability.

On September 16, 2021, the Defendants removed the action to the United States District Court for the Southern District of Florida (Dkt. 1), and on October 14, 2021, the Defendants filed their Motion to Dismiss the Amended Complaint. Dkt. 10. On November 9, 2021, after an approved extension, the Plaintiff filed its Response in Opposition to Defendants' Motion to Dismiss (Dkt. 14), and on November 19, 2021, the Defendants filed a Reply (Dkt. 17). While the Defendants requested a stay of discovery until the district court's ruling, the district court only granted a stay through January 31, 2022, and ordered the parties to file a proposed joint revised scheduling report by February 1, 2022. Dkt. 18. As such, on January 14, 2022, Defendants filed an appeal of the Order with this Court requesting that discovery be stayed in this matter until the district court could issue its ruling on Defendants' Motion to Dismiss. Dkt. 19. On February 1, 2022, the district court entered its Order dismissing Plaintiffs federal claims with prejudice, finding that the appeal of the discovery stay was moot, and remanding the state claims back to state court. Dkt. 22.

### D. Standard of Review

This Court "review[s] *de novo* the district court's grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Ironworkers Local Union 68 v. AstraZeneca Pharm., LP,* 634 F.3d 1352, 1359 (11th Cir.2011) (quotation marks omitted).

### Summary of the Argument

This Court should reverse the district court's Order dismissing Plaintiff's Amended Complaint with prejudice and remand with instructions to deny the Defendants/Appellees' Motion to Dismiss, bring back the state claims so that all counts under the Amended Complaint may tried together, and allow this action to proceed to the discovery phase.

**I.** The district court erred in granting the Individual Defendants motion to dismiss based on qualified immunity. The facts alleged in the Amended Complaint support that Defendants were deliberately indifferent to Mr. Beaz's medical needs under the 14th Amendment of the United States Constitution, as they acted consciously and with a purpose to cause harm. The Individual Defendants knew that Beaz was alive, knew of the extremely great risk of death, and acted consciously to withhold live-saving aid. The EKG is objective evidence that they knew Beaz was alive when they made this decision, and the Defendant County's own investigation

concluded that they could not explain why the Individual Defendants acted in the manner that they did. There was "no legitimate reasons" for their actions. In addition, qualified immunity does not bar the claim because Beaz's substantive due process rights were clearly established at the time of the incident. In *Waldron v. Spicher,* 954 F.3d 1297 (11th Cir. 2020), this Court explained that if a government actor exhibits conduct that rises to the level of a purpose to cause harm, this would constitute a constitutional violation. Additionally, there is persuasive authority which conveyed that a paramedics' failure to render aid to someone they knew to be alive would constitute a constitutional violation. *See, e.g., Anderson v. City of Minneapolis, et al.,* 18-1941 (8th Cir. 2019); *Ross v. United States,* 910 F.2d 1422 (7th Cir. 1990).

**II.** The district court erred in granting the County Defendant's motion to dismiss. First, the Amended Complaint alleges that there have been prior instances of similar conduct (*see, e.g.,* Dkt. 1-1, ¶¶ 35, 61, 69). The lower Court rejected these allegations by stating that there was no "citation to any report, to any cases involving similar violation, or to any newspaper accounts indicating even one other instance arising under such alleged customs." Dkt. 22, p. 8 n. 6. The lower Court again seems to have wanted Plaintiff to prove the claims against the County in the pleadings' stage, which is in effect applying a heightened pleading standard that is not permissible. *Hoefling v. City of Miami*, 811 F.3d 1271, 1276 (11th Cir. 2016). Second, it was also alleged that the likelihood of constitutional violations made the

need for supervision obvious. Employing paramedics, providing them with life-saving tools, but failing to take any steps whatsoever to ensure that they know how to utilize these tools and (importantly) that they are actually performing their job function to save lives, is tantamount to the scenarios contemplated in *Gold* and which would demonstrate an "obvious" need for supervision. *Gold v. City of Miami*, 151 F.3d 1346, 1352 (11th Cir. 1998). Alerting the employees to the fact that no such supervision or monitoring will be conducted makes the likelihood of constitutional violations all the more likely.

**III.** It was error for the district court to deny the Plaintiff's first request for leave to amend. The Amended Complaint was filed prior to the Defendants/Appellees ever being served, and the Plaintiff was never provided an opportunity to address any concerns the district court may have had as to the matters alleged. Rule 15 requires that leave to amend be "freely given" (Fed. R. Civ. P. 15), and "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

**Argument**

**I. THE DISTRICT COURT ERRED IN FAILING TO TAKE ALL ALLEGATIONS AS TRUE AND IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFF WHEN FINDING THAT (A) THE AMENDED COMPLAINT DID NOT STATE A CLAIM FOR VIOLATION OF A CONSTITUTIONAL RIGHT, AND (B) EVEN IF IT DID, ANY SUCH RIGHT WAS NOT CLEARLY ESTABLISHED.**

The district court's Order found that (1) the allegations did not state a claim for violation of substantive due process, and (2) even if they did, the Individual Defendants were entitled to qualified immunity from Plaintiff's claims "because their conduct did not violate clearly established law." Dkt. 10, p. 10. It is true that government agents are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* Plaintiff does not dispute that the Individual Defendants had discretionary authority and acted while performing their official duties, and as such, Plaintiff accepts that it must make a two-part showing to refute qualified immunity. First,

13

Plaintiff must show that the facts of the case make out a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Second, Plaintiff must show that the constitutional right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S at 232.

However, as with all issues at the motion to dismiss stage, the district court was required to consider these two questions by drawing the facts from the Amended Complaint, accepting all of Plaintiff's allegations as true, and construing all facts in the light most favorable to the Plaintiff. *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (en banc); *Butler v. Sheriff of Palm Beach County*, 2012 U.S. App. LEXIS 13844 (11th Cir. Fla. July 6, 2012); *citing Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1271 (11th Cir. 2012).

To survive a 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The plausibility standard is met where the facts alleged enable "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if

14

doubtful in fact)." *Butler*, 2012 U.S. App. LEXIS at \*8-9; *citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis added).

On a Motion to Dismiss, the issue for the court is not whether a plaintiff may ultimately prevail, "but whether the allegations are sufficient to allow [plaintiff] to conduct discovery in an attempt to prove their allegations." *Jackam v. Hosp. Corp. of Am. Mideast, Ltd.,* 800 F.2d 1577, 1579-80 (11th Cir. 1986). As the Supreme Court has noted:

> Discovery involving public officials is indeed one of the evils that *Harlow* aimed to address, but neither that opinion nor subsequent decisions create an immunity from *all* discovery. *Harlow* sought to protect officials from the costs of "broad-reaching" discovery, 457 U. S., at 818, and we have since recognized that limited discovery may sometimes be necessary before the district court can resolve a motion for summary judgment based on qualified immunity. *Anderson v. Creighton*, 483 U. S. 635, 646, n. 6 (1987); *see also Mitchell v. Forsyth*, 472 U. S. 511, 526 (1985).

*Crawford-El v. Britton*, 523 U.S. 574, 593, n.14 (1998). Notably, in *Crawford-El* and *Harlow*, the Supreme Court was addressing the question of qualified immunity and discovery within the context of a Motion for Summary Judgment and not on a Motion to Dismiss, as is presented in the case *sub judice.*

Given the applicable standards on a 12(b)(6) motion, case law supports the denial of the Defendant's Motion to Dismiss. "Motions to dismiss for failure to state a claim should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim." *Bracewell v. Nicholson Air Services, Inc.,*

680 F.2d 103, 104 (11th Cir. 1982). "A complaint should be liberally construed in favor of the plaintiff and not readily dismissed." *Id.* For the sake of brevity, Plaintiff will address just a few of the examples which it believes to unequivocally demonstrate the Order's failure to follow the aforementioned standards.

Based on the series of examples outlined below (in addition to the Order's language), the Plaintiff respectfully proffers that these mandatory standards were not applied. For the reasons as detailed in Section A below, Plaintiff submits that it has made plausible claims that the Individual Defendants acted with a purpose to cause harm to Beaz and that their actions shock the conscience. For the reasons as detailed in Section B below, Plaintiff submits that Beaz's substantive due process rights were clearly established and violated. As such, the district court's Order should be reversed.

### A. Plaintiff Has Stated A Plausible Claim For A Substantive Due Process Violation As The Actions Of The Individual Defendants As Alleged Demonstrate An Extreme and Deliberate Indifference And Purpose To Cause Harm Which Shocks The Conscience.

In the Amended Complaint, Plaintiff alleges a substantive due process violation based upon the Individual Defendants' deliberate indifference to the knowledge that Beaz was alive but would die if they did not act, and Plaintiff asserts that the actions or inactions of these Individual Defendants evidence a purpose to cause harm. Generally, a claim for deliberate indifference within the current factual context requires that the plaintiff had a serious medical need, the defendants were

deliberately indifferent to that need, and plaintiff's injury was caused by the defendants' deliberate indifference. *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). To show deliberate indifference, a plaintiff must allege: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Id*. Additionally, when making such allegations in a non-custodial setting, "conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003). The underlying action was instituted on the basis that the conduct of the Individual Defendants is the personification of "arbitrary or conscience shocking in a constitutional sense." *Id.* at 1305. What may constitute as "arbitrary and conscience shocking" conduct is necessarily fact dependent because "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998).

As this Court noted in *Waddell*:

> In this non-custodial setting, a substantive due process violation would, at the very least, require a showing of deliberate indifference to an extremely great risk of serious injury to someone in Plaintiffs' position. *See McClendon v. City of Columbia,* 305 F.3d 314, 326 (5th Cir. 2002) (stating that Plaintiff was required to demonstrate that "the defendant state official *at a minimum* acted with deliberate indifference toward the plaintiff"); *see also Nix v. Franklin County School Dist.,* 311 F.3d 1373, 1376 (11th Cir. 2002) (concluding that deliberate indifference

was insufficient to constitute a due-process violation in a non-custodial school setting).

. . .

To act with deliberate indifference, a state actor must know of and disregard an excessive — that is, an extremely great — risk to the victim's health or safety. *See McClendon,* 305 F.3d at 326 n. 8; *see also Johnson v. Dallas Indep. School Dist.,* 38 F.3d 198, 202 (5th Cir. 1994).

*Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1306 (11th Cir. 2003).

In *Waddell* the claims were based upon the death of Kristina Waddell that was caused by Terry Garnto. *Id.* Garnto was released from jail and utilized as an informant. *Id.* at 1302. Thereafter, Garnto drove while intoxicated and lost control of his vehicle, ultimately killing Waddell. *Id.* at 1303. The Court concluded that there could be no deliberate indifference based upon claims that the police released Garnto early, used him as a confidential informant, and failed to monitor him. *Id.* at 1308. That is a wholly different scenario than the case *sub judice* as the defendants in *Waddell* did not have any certainty or knowledge that Garnto would lose control of a vehicle and kill someone (*Id.*), whereas here the Individual Defendants knew that Beaz was alive, knew that if they failed to provide aid he would die, and deliberately chose not to act. *See* Dkt. 1-1, ¶¶ 37, 44, 45, 47, 48, 49, 50, 51, 52, 54, 56, 58, 59, 63, 65, 83, 93, 94; *see also* Dkt. 14, p. 7-10. Instead, the Individual Defendants chose to stand waiting and watching until Beaz's heart ultimately stopped due to a lack of oxygen – the very reason Beaz had called them for help. *Id.* Understanding that deliberate indifference in a non-custodial setting requires knowledge by the state

actor of "an extremely great" risk to the victim's health or safety. What greater risk is there than death? What greater risk could there possibly be than knowing a patient is alive, but not receiving oxygen, and will die unless you take action? What other purpose does a paramedic serve?

Plaintiff proffers that *Olson v. Barrett*, No. 6:13-CV-1886-ORL, 2015 WL 1277933 (M.D. Fla. Mar. 20, 2015), is similar to the case *sub judice* and respectfully submits that it should be considered as persuasive when evaluating the question presently before the Court. In *Olson*, police deputies went to a woman's home to perform a welfare check after reports that she was distraught and suicidal after losing her job. *Id.* at *1–3. Police instructed the woman to go, unaccompanied, into her home and get her driver's license. *Id.* Moments later, she shot herself in the chest. *Id.* While she was dying, no officers provided medical care, the officers refused the help of a neighbor, and even canceled a request for further emergency personnel. *Id.* The paramedics arrived nine minutes after the gunshot, but were too late to save the woman's life. *Id.* at *4. Her estate brought a claim for deliberate indifference. The district court found that the complaint stated a plausible claim for deliberate indifference based on the officers' failure to "undertake any lifesaving actions" in the minutes that the woman lay dying in front of them. *Id.* at *9–11.

Similarly, in *Groover et al v. Polk County Board of County Commissioners, et al.,* No. 8:2018cv02454 (M.D. Fla. 2020), which is practically identical[2] to the case *sub judice*, the district court was presented with a similar question at the pleadings' stage:

> Hamilton suffered a heart attack and Plaintiffs called for emergency medical services. Dkt. 98 ¶ 12. Emergency medical personnel (i.e., the Individual Defendants) promptly reached Hamilton, **but within five minutes pronounced him dead.** *Id.* ¶¶ 14, 15 & 17. **At no point during this short time on the scene did any of the Individual Defendants attempt to or actually administer medical care.** *Id.* ¶ 17. . . . In sum, **Plaintiffs have pled that Hamilton had a heart attack, the Individual Defendants knew this presented a serious medical risk, disregarded that risk, failed to provide even cursory medical care, and because of that Hamilton died.** Thus, Plaintiffs have made plausible claims that the Individual Defendants acted with deliberate indifference to Hamilton's medical needs **and those actions, as pled, shock the conscience.** While the facts may play out differently in

---

[2] While the *Groover* case is almost identical, there is one very important differentiating factor. In the case under review*,* there is objective evidence (the EKG reading which the Individual Defendants held in their hands) that clearly demonstrates that Beaz was very much alive and that the Individual Defendants *knew* he was alive when they refused to render aid. In *Groover*, there was no such evidence ever presented; in fact, all statements made by witnesses at the scene were that Groover was already dead. As such, although Plaintiff respectfully submits that *Groover* is instructive on the issue currently before this Court (i.e., whether the district court erred in dismissing the claims with prejudice), it is distinguishable in that the plaintiff in that case was never able to prove that the paramedics knew the patient was alive. In the present case, the Court (and, ultimately, the jury) need not take Plaintiff's word for it; the EKG reading alone is the clear irrefutable evidence that proves the Individual Defendants knew that Beaz was alive and deliberately chose not to render any aid. For purposes of deciding whether the claims should have been dismissed, the district court was required to take this allegation as true and in the light most favorable to the Plaintiff, yet it failed to do so. When you apply this to the precedent in this jurisdiction, the district court should have denied the Motion to Dismiss.

discovery, these Counts . . . will not be dismissed at this stage on this point.

*Groover et al v. Polk County Board of County Commissioners, et al.,* No. 8:2018cv02454, D.E. 117 at *20 (M.D. Fla. 2020) (emphasis added).

Plaintiff's allegations here are like those in *Olson* and *Groover*. Beaz was suffering from oxygen deprivation and called for emergency medical services. Dkt. 1-1, ¶¶ 26, 28-29, 42, 52. Emergency medical personnel (i.e., the Individual Defendants) reached Beaz within minutes but pronounced him dead within seconds despite their own EKG readings which showed he was alive. *Id.* at ¶ 55. Notwithstanding, none of the Individual Defendants attempt to or actually administer medical care. *Id.* at ¶¶ 39 55, 59. This is despite the allegation by Plaintiff that Beaz was alive and called for help himself just minutes before the Individual Defendants arrived. *Id.* at ¶¶ 26, 28, 29, 43.

Despite these allegations, and in furtherance of dismissing the Amended Complaint with prejudice, the district court's Order drew inferences in favor of the *moving* party by equating the "pulling of a stretcher and other equipment from the emergency vehicle" to the provision of medical aid. Dkt. 10, p. 3. What the Order fails to mention is that the remainder of the allegation states that all action immediately halted because the Individual Defendants instantly decided that Beaz was already dead. Dkt. 1-1, ¶ 55. This was before even checking his vitals or performing an EKG, and despite knowing that he had been communicating just

minutes before their arrival. Dkt. 1-1, ¶ 55. In fact, the Individual Defendants never entered Beaz's home with the necessary equipment to treat or with the stretcher in order to transport him. Dkt. 1-1, ¶ 56. The Plaintiff further alleged that "it is clear that the [Individual Defendants] decided that they would report Beaz was deceased, from the moment of arrival and without taking any efforts, otherwise they would have entered the home with the necessary equipment to treat and with the stretcher in order to transport him." Dkt. 1-1, ¶ 56. Under established precedent, the district court's failure to accept these allegations as true and construe them in the light most favorable to the Plaintiff was error. *See, e.g., Quality Auto Painting Ctr. of Roselle, Inc.*, 917 F.3d at 1260.

If there was ever any doubt that the district court (1) failed to accept all allegations as true, (2) failed to construe all allegations in the light most favorable to the Plaintiff, and (3) treated the Defendants' Motion to Dismiss as a Motion for Summary Judgment, footnote 2 in the Order makes it indisputable. Specifically, when addressing the allegations in the Complaint the district court stated:

> It should be noted that attribution to the "investigating EMS Captain" [by Plaintiff] does not include a citation or reference to any document, official or otherwise, nor is the Captain nor investigation process identified. Defendants assert the only incident report is the incident report regarding the emergency call in this matter, which contains no language regarding "false and misleading information" that the County "used as the basis for covering up the inadequacies of its employees". (DE 10 at 14 (citing DE 1-1 at 14–15, 17).) The source of this quote is not identified by name in either Plaintiffs' Amended Complaint or Response.

Dkt. 22, p. 3. By this footnote alone, the district court made it clear that it did not consider all of Plaintiff's allegations as true or in the light most favorable to the plaintiffs. In this particular instance, the district court expressed its doubt as to the veracity of Plaintiff's allegation regarding what the EMS Captain concluded in its investigation of Beaz's incident.[3] In fact, the court's Order seems determined to construe the allegations in the light most favorable *to the (moving party) Defendants*, and even appears to improperly weigh the allegations as if they were evidence on a motion for summary judgment.[4]

The district court then misconstrued the Defendants' cited argument and (erroneously) interpreted that the Defendants were claiming that no such report existed. Not only is this incorrect (Plaintiff is in possession of an *EMS Division Inquiry Report,* as referred to in Dkt. 1-1, ¶ 63), but more importantly, the district court was required to accept this allegation as true – without any additional support,

---

[3] Notably, the EMS Captain's conclusion is an admission by the County that the Paramedics acted in an illegitimate manner (i.e., "not able to find any legitimate reasons . . . as to why Rescue 27 made the decision not to resuscitate the patient").

[4] Despite what the Order states, a plaintiff is not required to "include a citation or reference to any document" in a complaint unless it is a document "upon which action may be brought." *Williams v. Palm Coast Blue Water Int'l Corp*., 954 So. 2d 1264, 1265 (Fla. 5th DCA 2007), citing to Fla. R. Civ. P. 1.130; *Mitchell v. Oce*, 112 So. 3d 678, 679 (Fla. 4th DCA 2013). Finding that the Amended Complaint was deficient because it did not provide additional citation or support for the quoted allegation is in essence treating the Motion to Dismiss as a Motion for Summary Judgment and "weighing the evidence" presented.

citation, or reference. Instead, the district court favored what the court believed to be the Defendants' position (i.e., that the report did not exist, albeit a mistaken interpretation of the Defendants' argument). Furthermore, when referencing this allegation and quote from the EMS Captain within the body of the Order, the district court inserted the phrase "purportedly found," further demonstrating the district court's disbelief as to the Defendant County's own findings on the Individual Defendants' egregious actions. Dkt. 10, p. 3. This directly contravenes the applicable standard to be applied on a 12(b)(6) motion.

As yet another example, the district court failed to draw inferences in the light most favorable to the non-moving party (Plaintiff) when addressing the PCR narrative and the allegations that the PCR contained false statements made by the Individual Defendants in an effort to cover up their malfeasance. The EKG reading alone (which was held in the hands of the Individual Defendants) shows that the reference to Beaz being in an asystole (i.e., a flat line, with no heartbeat) is wholly and patently false. Dkt. 1-1, ¶¶ 45, 47. Not only should the district court have accepted this allegation as true, but it is also based on objective and undeniable proof (i.e., the EKG reading).

In addition, it is a medical impossibility for Beaz to have been cold to the touch minutes after he was speaking. Dkt. 1-1, ¶ 52. Once again, not only is this alleged in the Amended Complaint, but the EMS Captain also specifically references

this fact in his findings of the *EMS Division Inquiry Report*. Dkt. 1-1, ¶¶ 63, 67. Notwithstanding the fact that the court must accept all allegations as true, these are two objective facts – from the Defendant County's own records – that support the Plaintiff's claims. As such, if the district court was drawing all inferences in the light most favorable to the non-moving party, the court should have inferred that the remaining factors noted in the PCR were also false as the Plaintiff alleges. Dkt. 1-1, ¶¶ 45, 52, 62, 85. Although not necessary at the pleadings' stage, the foregoing supports the Plaintiff's allegations that the Individual Defendants falsified the PCR in an effort to conceal their malfeasance.[5]

As if the foregoing examples were not enough to overturn the Order, the district court drew additional inferences in the light most favorable to the Defendants when addressing the protocol that dictates a paramedic's ability to withhold resuscitation, in support of a conclusory finding that the Individual Defendants acted reasonably. The district court drew this conclusion despite the allegation that, within its own report, the Defendant County admittedly came to the opposite conclusion. Dkt. 1-1, ¶ 63.

---

[5] A simply cursory review of the PCR and adjoining EKG reading would have made clear to any supervisor that the Individual Defendants had falsified the report and purposefully denied aid to Beaz, but because the Defendant County has employed an unofficial custom and policy of "don't ask, don't tell," these reports are never reviewed. Dkt. 1-1, ¶¶ 21, 22, 36, 62, 65, 70, 85.

First, the district court claims that the only allegations made are that the Individual Defendants "actions were inconsistent with industry standards," in order to find that the allegations "as pled do not rise to the level of constitutionally infirm conduct." Dkt. 10, p. 11. However, the Plaintiff has alleged much more than that. The Plaintiff has alleged that the Individual Defendants *knew* that Beaz was alive and deliberately *chose* not to render aid, *falsified* the Patient Care Report (PCR) to cover up their actions, *falsified* their en route times, and stood over him waiting until he flat-lined and then waited additional time in the hopes that the EKG transmitted to the PCR would show as a flat-line only. *See* Dkt. 1-1, ¶¶ 37, 44, 45, 47, 48, 49, 50, 51, 52, 54, 56, 58, 59, 63, 65, 83, 93, 94; *see also* Dkt. 14, p. 7-10. Second, when reviewing allegation 40 in the Amended Complaint regarding the Defendant County's Protocol 27, the district court quotes the very first sentence of the Protocol (the introduction to Protocol 27) and then incorrectly interprets and draws an inference that this introductory sentence somehow discredits the Plaintiff's allegation which directly quotes from the same Protocol (Dkt. 1-1, ¶ 40). Specifically, the district court infers that the reference to "obvious signs of irreversible biological death" equate to factors such as being cold to the touch or pulseless as the Individual Defendants (falsely) referenced in the PCR. However, that Protocol goes on to explain what "irreversible biological death" means, *which*

*are the very elements cited in the Amended Complaint*.[6] Dkt. 1-1, ¶ 40. Once again, the district court has not accepted the allegations pled as true and has misinterpreted provisions in order to construe inferences in the light most favorable to the *moving party* – in complete contravention of the applicable law and standard.[7]

Although the district court recited the applicable standard of review by acknowledging that it must "accept factual allegations as true and draw reasonable inference in the plaintiff's favor" (Dkt. 22, p. 5), it nonetheless ignored this well-established standard, the Plaintiff's Amended Complaint, the Plaintiff's memorandum of law as to the various theories of liability asserted against the Defendants, and the request for leave to amend. Instead, the district court based its ruling to dismiss the claims with prejudice solely on its opinion that the behavior of

---

[6] The very next paragraph of the Protocol states: "The following guidelines are to be used to determine whether cardiopulmonary resuscitation may be withheld or terminated." The guidelines listed are, *verbatim*, those included in the Amended Complaint. Dkt. 1-1, ¶ 40. Plaintiff has properly alleged that none of these guidelines were met or present in this case, indicating the Individual Defendants' knowledge that Beaz was alive and required oxygen – the very reason he called for their help.

[7] Finally, contrary to the district court's inference, the reference to Protocol 27 was not included to directly indicate that the Individual Defendants acted with a purpose to harm, but instead, when read in conjunction with all of the other allegations (e.g., the EKG reading they held in their hands which showed that he was alive and had a heartbeat, etc.), it shows that the Individual Defendants knew that Mr. Beaz was alive. Their decision to withhold aid, knowing he was alive, is evidence of their purpose to cause harm. Their act of maintaining the EKG leads on him, after he finally converted to a flat-line, and for much longer than is medically necessary, also evidences their purpose to cause harm, as they did so in the hopes that only the end of the EKG reading would transmit to the PCR. If so, no one would ever know that Beaz was alive when they evaluated him. Dkt. 1-1, ¶ 49-51, 58-59; Dkt. 14, p. 10.

the Individual Defendants – parsed from select, incomplete portions of the allegations asserted – "could not be characterized as more than gross incompetence." Dkt. 22, p. 12. Plaintiff respectfully submits that this Court should disagree based upon the totality of the allegations in the Amended Complaint (Dkt. 1-1) and the theories addressed in Plaintiff's Response in Opposition to the Motion to Dismiss (Dkt. 14).

The question is not whether the Plaintiff may ultimately prevail on its theories, but whether the *allegations* are sufficient to allow Plaintiff to conduct discovery in an attempt for them prove their allegations. *Jackam v. Hospital Corp. of America Mideast, Ltd.*, 800 F.2d 1577, 1579-80 (11th Cir. 1986). In this case, the Plaintiff has alleged that the Individual Defendants decided "they would report Beaz was deceased from the moment of arrival and without taking any efforts," (Dkt. 1-1, ¶ 56) and that they knew that Beaz was alive yet chose not to render any aid. Dkt. 1-1, ¶¶ 85, 95. The Plaintiff also provided allegations of objective facts to support these statements (e.g., that the Individual Defendants held in their hand an EKG reading which showed a heart rate and showed that Beaz was alive and not flat-lined [Dkt. 1-1, ¶¶44-45, 58-59]). Still, the district court's Order ignores various allegations in order to make a sweeping conclusion that the Individual Defendants' acts were not purposeful. The facts alleged (falsification of the PCR [Dkt. 1-1, ¶¶ 45, 94], falsification of response times [Dkt. 1-1, ¶ 37], knowledge that Beaz was alive but

chose not to render aid [Dkt. 1-1, ¶¶ 85, 95], standing and waiting over Beaz until he finally flat-lined and hoping the EKG reading transmitted to the PCR would not show that he was alive when they first evaluated him [Dkt. 1-1, ¶ 49-51, 58-59; Dkt. 14, p. 10], and that the EMS Captain concluded that there were no "legitimate reasons . . . as to why Rescue 27 made the decision not to resuscitate the patient" [Dkt. 1-1, ¶ 63]) exemplify purposeful actions. That the district court would dismiss the Amended Complaint with prejudice, and thereby deny leave to amend, simply because the word "purposeful" was not used, goes directly against what the Order claims is required; that is, more than "naked assertions."

To summarize, Plaintiffs have pled that Beaz was having difficulty breathing and was not receiving oxygen, the Individual Defendants objectively knew from his EGK that he was alive and would most certainly die if they did not provide aid, they purposefully refused to provide any aid despite that knowledge, and because of that Beaz died. These facts, alone, establish a plausible claim that the Individual Defendants acted with a purpose to harm Beaz and that those actions, as pled, shock the conscience. However, in addition to this, it was also alleged that the Individual Defendants took steps to conceal their knowledge that Beaz was alive when evaluated so that it would not later be discovered that they chose not to render any aid. Even if the district court misunderstood the science and protocols behind the Individual Defendants' knowledge, the simple fact is that these allegations were

asserted, and because of this, the district court was required to take these allegations as true and in the light most favorable to the Plaintiff. Consequently, even if the district court thought that the facts may play out differently in discovery, it was error to dismiss the claims at this stage.

**B. The Allegations As Pled Are Sufficient To Show That Beaz's Constitutional Right Was Clearly Established.**

The second inquiry is whether the constitutional right that the Individual Defendants violated was clearly established on the date of the incident, so that it would have been reasonably clear that their conduct was unlawful. *Pearson*, 555 U.S at 232. The following are ways in which it may be shown that a constitutional right was established: (1) a "materially similar case has already been decided, giving notice to the [government actor]," (2) a "broader, clearly established principle should control the novel facts in th[e] situation," or (3) the "case fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (internal citations omitted). The purpose in finding that a law is clearly established is to ensure that the defendant had "fair warning" that his/her conduct would constitute a violation. *McClish v. Nugent*, 483 F.3d 1231,1248 (11th Cir. 2007). In *Waldron*, this Court explained that acting with a purpose to cause harm in a non-custodial setting would meet both elements to overcome qualified immunity and constitute a violation of a clearly established right:

Finally, **the use of the power of law enforcement to disable all possible life-saving possibilities with the intent to cause harm** to the victim **is the epitome of the "abuse of power" and "instrument of oppression" that is at the core of what substantive due process is intended to protect against.** *Lewis*, 523 U.S. at 846, 118 S.Ct. 1708. Accordingly, because the Court in *Lewis* concluded there that a purpose to cause harm would violate substantive due process, we believe it is a matter of obvious clarity that, **if the *jury* finds that Spicher intended to cause harm to Ybarra in the form of death** or serious brain injury, and finds the other circumstances we assume in this summary judgment posture, **then we hold that Waldron would have proved a violation of clearly established substantive due process rights.**

*Waldron v. Spicher,* 954 F.3d 1297, 1311-12 (11th Cir. 2020) (emphasis added).

Not only is *Waldron* a binding case that explains it is a violation to an establish right to act with a purpose to cause harm, the Plaintiff respectfully submits that both (2) and (3) also apply here (although only one is needed). As was the case in *Olson*, the Individual Defendants "should not have needed case law" to know that Beaz was about to lose his life and needed immediate medical attention. *See Olson*, 2015 WL 1277933 at *12. It should be so obvious to a paramedic – whose sole purpose is to quickly respond to a medical emergency and offer aid – that refusing to provide aid to someone that he/she knew was alive, simply so that he/she could return back to sleep sooner, would constitute a violation of a person's constitutional rights, making prior case law unnecessary. Alternatively, this Court should apply this as a broader, clearly established principle that should control the novel facts of this situation. If paramedics (such as the Individual Defendants) are allowed to act in this fashion, their role  - the role for which taxpayers fund their salaries – will do much more

31

harm than good. In this particular case, as alleged, "Beaz would have called his paramedic son-in-law and daughter who lived just half a mile (0.5 mi) away" to assist him, had he known that the Individual Defendants would have acted in such a callous manner to ensure his death.

Similarly, while *Anderson v. City of Minneapolis, et al., 18-1941 (8th Cir. 2019),* is factually distinguishable, it is persuasive authority which conveys that a paramedic will not be afforded qualified immunity when the paramedic denies emergency aid to someone he/she knows to be alive. Contrary to the district court's finding (Dkt. 22, p. 14 n. 9), "[b]inding case law in this Circuit holds that the 'relevant legal landscape'—*including even cases from outside our Circuit and unpublished cases*—are informative in a court's determination of whether a particular constitutional right is clearly established." *Waldron,* 954 F.3d at 1307 (emphasis added).

Along the same vein, the persuasive authority of *Ross v. United States,* 910 F.2d 1422 (7th Cir. 1990), is instructive. In *Ross*, a little boy fell into a lake and sank. *Ross,* 910 F.2d at 1424. A Sherriff who arrived on site, Johnson, prevented on site professionals from engaging in rescue attempts. *Id.* at 1425. The Seventh Circuit found that the allegations of the complaint supported reversal of the district court's dismissal of the complaint against Johnson for a constitutional violation, based on the following facts:

Johnson knew that the boy had already been under the water for at least a few minutes, and because of his training, Johnson also knew that it could take as little as five minutes for a person to die by drowning. Either through their uniforms or through a quick inquiry, Johnson could have readily ascertained that the alternative on-site rescue personnel were qualified to save the drowning boy. Nevertheless, Johnson waited until twenty minutes later for the "authorized" rescue squad to arrive. Using the facts alleged in the plaintiff's complaint, it is clear that Johnson knew there was a substantial risk of death yet consciously chose a course of action that ignored the risk. Such conduct is reckless.

*Id.* at 1433. This case is wholly analogous to the Beaz's incident. Here, the Individual Defendants know that Beaz was alive, but he was having difficulty breathing and that a lack of oxygen would ultimately make his heart stop. They knew Beaz would die unless they provided him with care and transported him to the hospital. Despite knowing there was a definite result of death, they consciously chose a course of action that ignored that likely result.

In *Waldron*, this Court explained that it considered deliberate indifference and reckless disregard as synonymous. *Waldron,* 954 F.3d at 1308-09. In addressing these principles, this Court concluded that conduct rising to the level of reckless disregard for human life was insufficient "to state a violation of clearly established substantive due process rights." *Id.* at 1310. It requires "something more." *Id.* at 1308. Black's Law Dictionary defines "reckless" as "characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash." *Black's Law Dictionary,* Third Pocket Edition (2006). "Risk" is defined as "[t]he

33

**uncertainty** of a result, happening, or loss; the chance of injury, damage, or loss." *Id.* (emphasis added).

The facts of this case do not evidence mere recklessness or rashness; nor does the evidence reflect a mere disregard of a "substantial and unjustifiable risk of harm." The Individual Defendants were not "uncertain" that harm would come to Beaz. Rather, the evidence and facts set forth in the allegations are that the Individual Defendants ***knew*** that the sole definitive consequence of their actions would result in Beaz's death. When the EKG showed Beaz was alive and the Individual Defendants deliberately chose not to render any aid, instead falsely reporting to dispatch that Beaz was "dead on arrival," the Individual Defendants knew that there would be no one else coming to help, and by not timely rendering emergency aid when they were under a duty to do so, they guaranteed Beaz's death.

In both *Waldron* and the case to which it was compared (*Hamilton)*, the officer in question halted by-stander rescue efforts ***while believing that professional medical help was on the way***. *See Waldron,* 954 F.3d at 1307; *see also Id.* at 1306, citing to *Hamilton v. Cannon,* 80 F.3d 1525 (11th Cir. 1996) (noting the deputy "then examined Hamilton's condition, but did not himself undertake CPR efforts or take any other medical action on her behalf, apparently believing that Macon County's emergency medical technicians would arrive immediately after him"). Conversely, here the Individual Appellees ***were*** *the professional medical help* and knew that no

34

other help was on the way. They knew that if they did nothing, Beaz would eventually die, and they chose to stand over him waiting until he flat-lined. This is the "something more" that the precedent in this jurisdiction requires to establish a constitutional violation of a clearly established right.

When ruling on the Individual Defendants' Motion to Dismiss, the district court was required to remain within the four corners of the Amended Complaint and to take all allegations as true – including the allegation that the Individual Defendants knew that Beaz was alive and yet deliberately chose not to provide any aid, instead falsely reporting that he was dead on arrival so that they could return to their station to sleep. Based upon these allegations and the established precedent in this jurisdiction, the Individual Defendants should have known that acting with a purpose to harm in this scenario, by refusing aid to a person they knew to be alive, would constitute a violation of a clearly established right for which they would not be afforded qualified immunity.[8]

---

[8] "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by *Hope v. Pelzer*, 536 U.S. 730, 122 (2002).

**II. PLAINTIFF HAS PROPERLY ALLEGED A §1983 MUNICIPALITY CLAIM AS THE AMENDED COMPLAINT ASSERTS (A) ALLEGATIONS OF PRIOR SIMILAR CONDUCT; AND (B) ALTERNATIVELY, THE LIKELIHOOD OF CONSTITUTIONAL VIOLATIONS MADE THE NEED FOR SUPERVISION OBVIOUS.**

The district court found that Plaintiff failed to state a claim against the County because (1) Plaintiff failed to allege an underlying constitutional violation, and (2) Plaintiff failed to allege either an "'officially adopted policy'" or "a custom which would provide the basis for the County's liability under Section 1983." Dkt. 22, p. 7. For the reasons stated in Section I, above, the Plaintiff respectfully submits that it has stated a claim for violation of a constitutional right. As such, this section shall focus on the second inquiry.

As acknowledged by the lower Court, "Under Section 1983, local governments can be sued for monetary, declaratory, or injunctive relief for alleged unconstitutional action pursuant to an officially adopted policy, ordinance, regulation, or decision; or a governmental custom which 'has not received formal approval through . . . official decision making [sic] channels.' Dkt. 22, p. 6, citing to *Monell v. Dep't of Soc. Servs. Of City of New York,* 436 U.S. 658, 690-91 (1978). "Municipal liability may also attach if final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure. *Hoefling v. City of Miami,* 811 F.3d 1271, 1279 (11th Cir. 2016) (citations omitted).

However, in addition to this "[a] municipality can also be held liable under §
1983 when its employees cause a constitutional injury as a result of the
municipality's policy- or custom-based failure to adequately train or supervise its
employees. *Am. Fed'n of Labor v. City of Miami,* 637 F.3d 1178, 1188 (11th Cir.
1998), citing to *Gold,* 151 F.3d at 1350. "To establish a 'deliberate or conscious
choice' or such 'deliberate indifference,' a plaintiff must present some evidence that
the municipality knew of a need to train and/or supervise in a particular area and the
municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at
1350, citing to *Board of County Com'rs v. Brown*, 520 U.S. 397, 117 S.Ct. 1382,
1390–91 (1997).

### A. Plaintiff Sufficiently Alleges That The Defendant County Knew Of A Need To Supervise Based On Prior Constitutional Violations.

As another example of how the district court failed to accept all of Plaintiff's
allegations as true and in the light most favorable to the non-moving party, the Order
states that "nowhere in the six (6) pages dedicated to Count I of Plaintiffs' Amended
Complaint do they offer any more detail other than the conclusory allegations that
Miami-Dade Fire had a custom of 'failing to render aid.'" Dkt. 22, p. 7. This sentence
wholly mischaracterizes the Plaintiff's claim. Nowhere in the Amended Complaint
does it state that "Miami-Dade Fire had a custom of failing to render aid." The
district court clearly erred in reaching this unsupported conclusion. Instead, one of
the many allegations asserted states that "the *conduct* of the PARAMEDICS in

37

failing to render aid *was the result of* a policy statement, regulation or decision officially adopted and promulgated by the DEPARTMENT, or its officials, or the result of the DEPARTMENTS' practice and custom." Dkt. 1-1, ¶ 80. As further explained in the Response in Opposition to the Motion to Dismiss, it is the County's unofficial policy or custom of "don't ask, don't tell" that led to and encouraged the conduct of the Individual Defendants in this case, who were emboldened in their actions through the knowledge that the County would never review the PCR to ensure that policies were being followed and violations were not being committed, and knowledge that they would never be disciplined commensurate with their actions. Dkt. 14, p. 16-17.

It is true that Plaintiff's municipal liability claim is not based on an officially-adopted policy, as it would surely be difficult to ever find a municipality with an officially-adopted "don't ask, don't tell" policy of: (1) allowing its employees to falsify PCRs, (2) turning a blind eye to the inadequacy of its employees by not having a policy or procedure in place by which the PCRs are reviewed in order to ascertain whether its employees are following emergency protocols – something that is done in every other South Florida fire rescue department, (3) allowing employees to violate Florida law, and (4) taking no action even when its own investigation concluded that there was no legitimate reason as to why its employs failed to render aid to Beaz. *See* Dkt. 1-1. However, the Plaintiff's Amended Complaint alleges the

foregoing, as well as additional facts that the lower Court was required to accept as true, but did not.[9]

---

[9] For example, the Amended Complaint asserts that: "the Department does not have a proper system in place to review the actions taken by its employees during an emergency call in order to evaluate and confirm whether policies are being followed and whether any corrective measures, disciplinary action, or additional training is necessary" (Dkt 1-1, ¶ 22); "the Department has exhibited a deliberate indifference with regard to its employees' compliance with required response times and how this may affect patients who are waiting to be assisted" (*Id.* at ¶ 24); "the Department has exhibited a deliberate indifference with regard to its employees' compliance with medical protocols and policies and procedures that are implemented in order to save the lives of citizens" (*Id.* at ¶ 25); "an investigation was performed only after a complaint was made on behalf of Mr. Beaz's surviving children" (*Id.* at ¶ 63); when Mr. Beaz's children contacted the EMS Officer in Charge ("OIC") to initially report the incident, the OIC explicitly stated during the call "'don't worry, no one will get in trouble over this'" even though he also stated during the same call "that there was no explanation for why the PARAMEDICS failed to render care or transport Mr. Beaz" (*Id.* at ¶ 66); when the investigation was finally performed, several months after the incident was reported, the conclusion reached by the EMS Captain who performed the investigation was that he "was not able to find any legitimate reasons in the protocols as to why Rescue 27 made the decision not to resuscitate the patient" (*Id.* at ¶ 63); "[a]s a direct result of the DEPARTMENT'S inattentiveness and failure to properly supervise its employees, the DEPARTMENT created an environment where improper practices and customs are rampant, unreported, undetected, and permitted to continue without consequence" (*Id.* at ¶65); "[i]t is the lack and absence of proper oversight and review by the DEPARTMENT which are the driving force behind the PARAMEDICS' misconduct in this case" (*Id.*); "PARAMEDICS know that they will not face any true repercussions when they falsify response times, fail to administer aid, or commit any number of serious acts which endanger the lives of citizens and which show a disregard for the consequences" (*Id.*); "no matter how egregious the constitutional violation committed or the injury that occurs (i.e., even the untimely death of a citizen), the DEPARTMENT is unwilling to implement and enforce policies and procedures to combat known improper practices and policy violations by its employees" (*Id.* ¶ 68).

Contrary to the Orders' finding, the Plaintiff does allege that there are prior incidents of constitutional violations (e.g., "[b]ased upon information and belief, this is not the first time that the DEPARTMENT's employees incorrectly determine that a citizen is "dead on arrival" nor is it the first time that the DEPARTMENT's employees falsify response times" [Dkt. 1-1, ¶¶ 35, 61, 69]). Under the applicable pleading standard, this is sufficient to survive a Motion to Dismiss. These allegations include prior instances of falsifying en route times, failure to follow policies, and pronouncements of citizens as "Dead on Arrival" when County's employees knew that citizens were in fact alive. *Id.* The lower Court rejected these allegations by stating that there was no "citation to any report, to any cases involving similar violation, or to any newspaper accounts indicating even one other instance arising under such alleged customs." Dkt. 22, p. 8 n. 6. The lower Court again seems to require Plaintiff to prove the claims against the County in the pleadings' stage, which is in effect applying an impermissible heightened pleading standard. *Hoefling v. City of Miami*, 811 F.3d 1271, 1276 (11th Cir. 2016). Furthermore, it is worth noting that even though not required at this stage of the proceedings, Plaintiffs did try to collect records evidencing their knowledge of prior similar instances, but the County failed to comply with a public records' request that was made for that specific purpose. *See* Dkt. 14, p. 14. The County should not be rewarded at this stage for purposely concealing information. Requiring more of any plaintiff at this stage, as the lower

40

Court has done, especially when a plaintiff is prevented access to information, creates absolute immunity for the County. If this Court agrees, it would only perpetuate the very injustice and deliberate indifference of the County which the Plaintiff seeks to eradicate.

**B. Alternatively, The Need For Supervision Was So Obvious That Prior Incidents Are Not Needed.**

Plaintiff's alternative theory is that evidence of prior incidents is **not** required to establish the County's policy under binding precedent. In its Response in Opposition to the Motion to Dismiss (Dkt. 14, p. 14-16), the Plaintiff addressed *Gold,* which supports the proposition that "evidence of previous incidents is not required to establish city policy if the need to train and supervise in a particular area is 'so obvious' that liability attaches for a single incident." *See Gold,* 151 F.3d at 1352. However, the district court rejected this argument by making a sweeping conclusion that "Plaintiffs cannot manufacture a County or Miami-Dade Fire custom based on broad-sweeping conclusory statements without citation to any supporting documents or other specific examples indicative of such a custom." Dkt. 22, p. 8. Once again, the district court notes that it dismissed the Plaintiff's claims with prejudice on the basis that it did not attach "supporting documents" to the Amended Complaint, while ignoring the majority of the allegations asserted and the theories

addressed in Plaintiff's Response in Opposition which asked the court to grant leave to address its concerns.[10]

Still, the district court's Order dismissing the claim states: "Plaintiffs do not explain how the defendant paramedics' actions on April 2, 2019 constitute an area where the likelihood of constitutional violations is as highly predictable as the circumstances discussed in *Gold*." Dkt. 22, p. 9. In finding as such and denying Plaintiff leave to amend upon its first request, the district court effectively prevented Plaintiff from answering the question (which was posed for the first time) and presumed that the Plaintiff could not address or allege any facts in support. Once again, the district's court's Order acts as a decision on the merits, which is a misapplication of the 12(b)(6) standard of review.

Plaintiff respectfully submits that the district court erred in this assumption. First, Plaintiff did allege in detail the inconsistencies found in the PCR (as noted above) and that the only reason the Individual Defendants felt emboldened to falsify essentially every single critical detail of their report is because they were confident that the County (as it is doing in this case), would insulate and protect them even when their egregious (atrocious) actions leading to Beaz's death are brought to light.

_____

[10] Essentially, the lower Court incorrectly applied a heightened pleading standard in direct contradiction to the *Twombly – Iqbal* plausibility standard that has been adopted by the 11th Circuit. Federal Rule of Civil Procedure 8(a)(2) required only that Plaintiff's Amended Complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

So unconcerned are the County's employees (including the Individual Defendants) with any repercussions that the EMS Officer in Charge, to whom Beaz's children initially reported the incident, told them "don't worry, no one will get in trouble over this." Dkt. 1-1, ¶ 66. This comment, made by the head of the County responsible for all emergency services, could not have been made in the vacuum of this one particular case. To make such a statement, even in a case where the County itself cannot justify the actions of the Individual Defendants it employs (*see* Dkt. 1-1, ¶¶ 63, 66) supports Plaintiff's allegations that the County, over time, has created a mentality and environment where its employees have no fear of consequences or repercussions for their actions and where the likelihood of constitutional violations is highly predictable.

Second, employing paramedics with a lack of supervision, providing them with life-saving tools, but failing to take any steps whatsoever to ensure that they are actually performing their job function to save lives, is tantamount to the scenarios contemplated in *Gold* and which would demonstrate an "obvious" need for supervision. *Gold*, 151 F.3d at 1352. "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994),

overruled in part on other grounds by *Hope v. Pelzer*, 536 U.S. 730, 122 (2002). It should be obvious to the County that if their employees, including the Individual Defendants, know that there is no supervision to ensure that they are following protocol, situations like the one involving Beaz will occur with the end result (in many cases) being an untimely death.

As further support for this theory of liability, the Plaintiff has also alleged known facts, including the existence and designation of "Retirement Stations" (such as the one involved in this case) and that these are the worst offenders for violations of the Defendant County's policies. *See* Dkt. 1-1, ¶¶ 20, 73(h). Despite knowing of these employee-designated "Retirement Stations," of the need to properly supervise these stations to ensure compliance, and having the ability to monitor response times and review all PCRs to ensure that policies are being followed, the County takes no such action even though it understands that its employees will be the deciding factor between life and death for its constituents. The County is the only emergency services department in all of South Florida that does not have an established policy in place establishing at least one or two levels of supervisory review for each PCR that is submitted following a medical call, yet these allegations seem to have been completely ignored by the lower Court. *See* Dkt. 1-1, ¶¶ 20, 73(h); Dkt 14, p. 17. Plaintiff also believes discovery will show that it is the only emergency services department in the entire State of Florida that fails in this regard. The aforementioned

44

allegations sufficiently establish, for purposes of a Rule 12(b)(6) motion, that the Defendant County knew of a need to supervise, but it made a deliberate choice not to take any action. *See Gold*, 151 F.3d at 1350.

Had the lower Court applied the correct standard in this case, accepted as true the facts alleged in Plaintiff's Amended Complaint, and drawn all reasonable inferences in Plaintiff's favor, the district Court should have reached the conclusion that the County's failure to supervise its employees under the allegations as pled provide a sufficient basis for the County's liability under §1983. "At this early stage of litigation, prior to discovery, plaintiff need not make any greater showing." *Bracewell v. Nicholson Air Services, Inc.*, 680 F.2d 103, 105 (11th Cir. 1982).

## III. IT WAS AN ABUSE OF DISCRETION TO DISMISS THE AMENDED COMPLAINT WITH PREJUDICE AND DENY LEAVE TO AMEND UPON THE PLAINTIFF'S FIRST REQUEST.

Even if this Court were to find that dismissal of the Amended Complaint was proper, it was nonetheless error for the district court to deny Plaintiff's first request for leave to amend. While the Order below does not in any way reference the request for leave to amend, the act of dismissing the complaint with prejudice is effectively a denial of that request. The district court provided no reason as to why the Plaintiffs were not afforded an opportunity to amend, especially in light of the fact that leave had not previously been requested. While the Plaintiff is proceeding under an Amended Complaint, the amendment to the original Complaint was filed in state

court before the Defendants were served (without a request for leave) and before the case was removed to federal court. In essence the Court truly denied a first substantive amendment of the complaint, which contravenes established precedent.

As the United States Supreme Court has explained:

Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. *See generally*, 3 Moore, Federal Practice (2d ed. 1948), §§ 15.08, 15.10. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

Despite requesting leave to amend on four (4) occasions through the Plaintiff's Response in Opposition, the district court's Order fails to address the reason or provide a basis as to why leave to amend was denied despite the Rule 15 requirement that leave be "freely given." Fed. R. Civ. P. 15. As the Supreme Court of the United States explained, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely

abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman*

*v. Davis*, 371 U.S. 178, 182 (1962).

This Court's ruling in *Thomas v. Town of Davie*, is instructive here:

> We cannot say that dismissal of Thomas' § 1983 claim without leave to amend was proper. More specific allegations (e.g., why Thomas' need for medical attention was obvious, why the defendants should have known that Thomas needed medical attention) would have remedied the pleading problems found by the district court. In addition, there was no undue delay, bad faith or dilatory motive on Thomas' part, and the defendants would not have been prejudiced by amendment of count II of the complaint. *Dussouy,* 660 F.2d at 598-99. Furthermore, it does not appear beyond doubt that Thomas cannot prove a set of facts which would entitle him to relief.

*Thomas v. Town of Davie*, 847 F.2d 771, 772 (11th Cir. 1988).

Similarly, in this matter, if the district court felt that the allegations were in some way deficient, the Plaintiff should have been afforded an opportunity to amend in accordance with Rule 15. There was no undue delay, bad faith or dilatory motive on the Plaintiff's part, and the Defendants would not have been prejudiced by the amendment. The case *sub judice* was in its initial stages and before any discovery had commenced. Accordingly, Plaintiff asks that the district court's Order be reversed, and if this Court deems necessary, that Plaintiff be provided with an opportunity to amend its pleading.

## **Conclusion**

This Court should reverse the dismissal of Plaintiff's Amended Complaint under qualified immunity grounds and for failure to state a claim, and remand with instructions to reinstate the Amended Complaint and allow the case to proceed on the merits with all claims (federal and state) being heard in the same action.

Dated: May 27, 2022

LAW OFFICES OF MAX R. PRICE, P.A.
By: /s/ Max R. Price_____
MAX R. PRICE, ESQ.
FBN: 651494
*Attorney for Plaintiff/Appellant*

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

I HEREBY CERTIFY that this document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,833 words.

This document also complies with the typeface requirements of the Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2204, in 14-point Times New Roman text.

Dated: <u>May 27, 2022</u>

By: <u>/s/ Max R. Price</u>_____
MAX R. PRICE, ESQ.
FBN: 651494
*Attorney for Plaintiff/Appellant*

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing has been e-filed via CM/ECF and furnished via e-mail, this 27th day of May, 2022, upon the following: Zach Vosseler, Assistant County Attorney, 111 N.W. First Street, Suite 2810, Miami, Florida 33128, zach@miamidade.gov.

By: <u>/s/ Max R. Price</u>_____
MAX R. PRICE, ESQ.
FBN: 651494